UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA CIVIL LIBERTIES UNION FOUNDATION, INC., INDIANA CIVIL LIBERTIES UNION, INC., and JANE HENEGAR, KATHRYN BLAIR, and NEIL HUDELSON, *on their own behalf and on behalf of a class and subclass of those similarly situated*, <br><br> *Plaintiffs*, <br><br> v. <br><br> SUPERINTENDENT, INDIANA STATE POLICE, MAYOR OF INDIANAPOLIS, and MARION COUNTY PROSECUTOR, *in their official capacities*, <br><br> *Defendants*. | No. 1:20-cv-01094-JMS-TAB |

## **ORDER**

In the last four weeks, more Americans have exercised their First Amendment rights by protesting systemic racial inequality in this country than in perhaps the last four years.  Americans' exercise of their freedom of speech is shaping the way in which our country will move forward during this pivotal time in our history.  Juxtaposed against this backdrop, the State of Indiana has a statute in place which restricts speech it labels panhandling and which is to be amended, effective July 1, 2020.  The amended version of the statute will effectively prohibit all panhandling – long established by the United States Supreme Court as a form of First Amendment expression – in downtown Indianapolis and other urban areas within the state.  Almost exactly 140 years ago, Frederick Douglas said "No right was deemed by the fathers of the Government more sacred than the right of speech….  Liberty is meaningless where the right to utter one's thoughts and opinions has ceased to exist.  That, of all rights, is the dread of tyrants.  It is the right which they first of all

1

strike down."[1]  As discussed below, Indiana's panhandling statute, in both its pre-amendment form and as revised by the amendments that are to take effect on July 1, 2020, is an unconstitutional prohibition on the freedom of speech, and its enforcement must be enjoined.

# I.
## BACKGROUND

Plaintiffs the Indiana Civil Liberties Union Foundation, Inc. and the Indiana Civil Liberties Union, Inc. (collectively, the "ACLU of Indiana"), and three of their employees, have initiated this class action against Defendants the Superintendent of the Indiana State Police (the "Superintendent"), the Mayor of Indianapolis (the "Mayor"), and the Marion County Prosecutor (the "Prosecutor") to enjoin enforcement of the pre-amendment and amended versions of Indiana Code § 35-45-17-2, a statute that prohibits certain panhandling activities.  The amendments to § 35-45-17-2 are set to take effect on July 1, 2020, and this Order discusses Plaintiffs' Motion for Preliminary Injunction, [Filing No. 10], which is now ripe for the Court's decision.

# II.
## STATEMENT OF FACTS[2]

### A.  The Parties to the Litigation

The ACLU of Indiana is an organization made up of more than 14,000 members, whose goal is the protection and advancement of constitutional rights.  [Filing No. 22-1 at 2.]  The ACLU

---

[1] Frederick Douglas, *Plea for Free Speech in Boston*, June 8, 1880.

[2] Defendants do not dispute the facts that Plaintiffs set forth in their brief in support of their Motion for Preliminary Injunction.  [*See* Filing No. 28 at 1-3.]  Additionally, Defendants cite to "Ex. A" in the "Background" section of their response brief, [*see, e.g.*, Filing No. 28 at 3 (Defendants stating "The ACLU volunteers collect no more than $50 through their solicitation at Monument Circle on each Constitution Day (Ex. A, Int. 11)"], but did not file any exhibits with their response brief.  Consequently, the Court is unsure to which document they are referring when they cite to "Ex. A."  In any event, the statements purportedly in "Ex. A," which Defendants set forth in the "Background" section of their response brief, do not conflict with the statements Plaintiffs cite in their brief in support of their Motion for Preliminary Injunction.

of Indiana advances its goal through community education, legislative and administrative advocacy, and litigation.  [Filing No. 22-1 at 2.] Plaintiff Jane Henegar is the Executive Director of the ACLU of Indiana.  [Filing No. 22-1 at 1.] Plaintiff Kathryn Blair is the Director of Advocacy and Public Policy for the ACLU of Indiana.  [Filing No. 22-3 at 1.] Plaintiff Neil Hudelson is the Director of Philanthropy at the ACLU of Indiana.  [Filing No. 22-2 at 1.] On this day, the Court certified a class, represented by Ms. Henegar, Ms. Blair, and Mr. Hudelson, of "[a]ll persons in the State of Indiana who engage, or will engage, in panhandling, as defined by Indiana Code § 35-45-17-1," and a subclass of "[a]ll persons in the City of Indianapolis who engage, or will engage, in panhandling, as defined by Indiana Code § 35-45-17-1."

The Superintendent is the head of the law enforcement body that "polices property owned and controlled by the State of Indiana and has law enforcement and arrest authority on all properties in Indiana."  [Filing No. 1 at 3.] The Mayor is "the duly elected head of Indiana's largest city and controls the Indianapolis Police Department, the law enforcement body that polices the City of Indianapolis, including its downtown area."  [Filing No. 1 at 3.] The Prosecutor is "the duly elected prosecutor for Marion County, Indiana," the Indiana county within which Indianapolis is located.  [Filing No. 1 at 3.][3]

### B.  The Statute at Issue

Indiana Code § 35-45-17-1 defines "panhandling" as follows:

(a) As used in this chapter, "panhandling" means to solicit an individual:
    (1) on a street or in another public place; and

---

[3] Plaintiffs and the Mayor filed a Joint Motion requesting that the Court approve their agreement that the Mayor be relieved of any obligation to participate in the briefing of motions "or otherwise take any further role or part in this litigation," but that he will be bound by the Court's rulings in this case.  [Filing No. 25.]  The Court approved the agreement entered into between Plaintiffs and the Mayor.  [Filing No. 27.]  Defendants' response brief was filed by counsel for the Superintendent and the Prosecutor but, for simplicity, the Court refers to "Defendants" in this Order.

(2) by requesting an immediate donation of money or something else of value.

(b) The term includes soliciting an individual:

(1) by making an oral request;

(2) in exchange for:

(A) performing music;

(B) singing; or

(C) engaging in another type of performance; or

(3) by offering the individual an item of little or no monetary value in exchange for money or another gratuity under circumstances that would cause a reasonable individual to understand that the transaction is only a donation.

(c) The term does not include an act of passively standing, sitting, performing music, singing, or engaging in another type of performance:

(1) while displaying a sign or other indication that a donation is being sought; and

(2) without making an oral request other than in response to an inquiry by another person.

Ind. Code § 35-45-17-1.

The statute at issue in this case is Indiana Code § 35-45-17-2. It criminalizes certain panhandling as a Class C misdemeanor. Amendments to § 35-45-17-2 are set to take effect on July 1, 2020, and the following chart summarizes the prohibitions on panhandling set forth in the pre-amendment version of the statute and the amended version:

| Prohibits Panhandling: | Pre-Amendment Version of § 35-45-17-2 | Amended Version of § 35-45-17-2 |
|---|---|---|
| After sunset and before sunrise | √ | |
| When the individual being solicited is at a bus stop or in a vehicle or facility used for public transportation | √ | √ |
| In a motor vehicle that is parked or stopped on a public street or alley, unless the person soliciting the individual has the approval to do so by a unit of local government that has jurisdiction over the public street or alley | √ | √ |
| In the sidewalk dining area of a restaurant | √ | √ |
| Within 20 feet of an automated teller machine or the entrance to a bank | √ | |
| Within 50 feet of an automated teller machine or the entrance or exit to a bank, business, or restaurant, or the location where a financial transaction occurs | | √ |

4

| | | |
|---|---|---|
| Within 50 feet of a public monument | | √ |
| While touching the individual being solicited without the solicited individual's consent | √ | √ |
| While the individual being solicited is standing in line and waiting to be admitted to a commercial establishment | √ | √ |
| While blocking the path of the individual being solicited or the entrance to a building or motor vehicle | √ | √ |
| While using profane or abusive language during a solicitation, or after the individual being solicited has declined to donate money or something else of value | √ | √ |
| While making a statement, a gesture, or another communication to the individual being solicited that would cause a reasonable individual to fear for the individual's safety or feel compelled to donate | √ | √ |
| With at least one other individual | √ | √ |
| And then following or accompanying the solicited individual without the solicited individual's consent after the solicited individual has declined to donate money or something else of value | √ | √ |

As outlined above, the amended version of § 35-45-17-2 expands the prohibition on panhandling from within twenty feet of an automated teller machine ("ATM") or the entrance to a bank to within fifty feet of an ATM, the entrance or exit to a bank, business, or restaurant, or the location where a financial transaction occurs. Ind. Code § 35-45-17-2(1)(E) (amended eff. July 1, 2020). Indiana Code § 35-45-17-0.5, which is to take effect on July 1, 2020, seeks to define "financial transaction" as:

> [A]ny exchange of currency by cash, note, or credit card or through a wireless portal that is received by:
> (1) a business;
> (2) a parking meter or parking pay station on a street or another public place;
> (3) a public parking garage or parking lot pay station;
> (4) a facility or pay station operated by a public transportation authority; or
> (5) a restaurant or the service area of an outdoor seating establishment.

Ind. Code § 35-45-17-0.5 (amended eff. July 1, 2020). The amended version of § 35-45-17-2 also adds a prohibition on panhandling within fifty feet of a public monument. Ind. Code § 35-45-17-

2-(1)(F) (amended eff. July 1, 2020).  Indiana Code § 35-45-17-1.5, which also is to take effect on

July 1, 2020, seeks to define "Public monument" as "a building, structure, or site that is of historical

importance or interest that is preserved as public property."  Ind. Code § 35-45-17-1.5 (amended

eff. July 1, 2020).

### C.  Plaintiffs' Past and Future Activities on Constitution Day

Constitution Day is a holiday that was recognized by Congress in 2004 to celebrate and

commemorate the signing of the final draft of the United States Constitution at the Constitutional

Convention on September 17, 1787.  [Filing No. 22-1 at 2.]  Each year, the ACLU of Indiana and

its staff and volunteers celebrate Constitution Day.  [Filing No. 22-1 at 2.]  The ACLU of Indiana

sees Constitution Day as an opportunity to inform Hoosiers of the importance of the Constitution

and of the work that the ACLU of Indiana does to protect and secure the rights created by the

Constitution.  [Filing No. 22-1 at 2.]  Beginning in 2016, and every year after that, staff and

volunteers of the ACLU of Indiana have gone to Monument Circle and its immediate vicinity in

downtown Indianapolis on Constitution Day, from late morning until early afternoon, and

distributed small copies of the Constitution.  [Filing No. 22-1 at 2.]  The small copies are mass

produced by the National American Civil Liberties Union, have little or no monetary value, and

are supplied to the ACLU of Indiana without cost or at a very low cost.  [Filing No. 22-1 at 3.]

The ACLU of Indiana chooses to distribute the small copies of the Constitution on Constitution

Day from late morning to early afternoon because pedestrian traffic is heaviest during that time.

[Filing No. 22-1 at 3.]

The Soldiers and Sailors Monument (the "Monument") is situated at Monument Circle,

inside a traffic circle formed by the intersection of Market and Meridian Streets in downtown

Indianapolis.  [Filing No. 22-1 at 3.]  Wide steps lead up to the Monument on its north and south

sides, and the steps and the areas immediately in front of the steps are frequently the site of rallies, protests, and group activities. [Filing No. 22-1 at 3-4.] The Monument property is owned by the State of Indiana, as are the Indiana War Memorial, the Veteran's Memorial Plaza, the American Legion Mall, and University Park. *See* Ind. Code § 10-18-1-16 through § 10-18-1-20; Ind. Code § 10-18-1-23.

A brick sidewalk encircles the Monument. [Filing No. 22-1 at 4.] The sidewalk is approximately 20 feet wide, and there are numerous restaurants, banks, and other business lining the sidewalk, including: the headquarters of Indianapolis Power and Light Company; an Old National Bank branch office with three ATMs inside the entrance; Rocket Fizz, a candy store; Potbelly Sandwich Shop, which has seasonal outdoor seating at sidewalk tables; Starbucks, which has seasonal outdoor seating at sidewalk tables; Chase Bank, which has an ATM directly east of the intersection of Market Street and the Circle; the Columbia Club, which includes a restaurant and rooms for overnight accommodations; a pay station for bicycle rentals; Christ Church Cathedral; Forum Credit Union; an ATM; an H&R Block Office; a vacant business property; an optometry and eyewear business; the entrance to Emmis Communication Center; South Bend Chocolate Company, which has seasonal outdoor seating; and Au Bon Pain, which also has seasonal outdoor seating at sidewalk tables. [Filing No. 22-1 at 4; Filing No. 22-2 at 1-3.]

Ms. Henegar has participated in Constitution Day activities in the past at Monument Circle, and intends to participate in the event planned for September 17, 2020 on Monument Circle as well as future celebrations. [Filing No. 22-1 at 1; Filing No. 22-1 at 4.] She has been joined at past celebrations by Ms. Blair and Mr. Hudelson. [Filing No. 22-1 at 4; Filing No. 22-2 at 1; Filing No. 22-3 at 1.] Ms. Blair and Mr. Hudelson plan to join Ms. Henegar at the 2020 Constitution Day

celebration on Monument Circle and at future celebrations.  [Filing No. 22-2 at 1; Filing No. 22-3 at 1.]

At the Constitution Day celebration in 2019, there were approximately 20-25 people participating on behalf of the ACLU of Indiana, including employees and volunteers.  [Filing No. 22-1 at 4.]  Staff placed a table half-way up the stairs on the south side of the Monument with banners, so that the display was easily visible.  [Filing No. 22-1 at 4-5.]  Staff and volunteers, in teams of two, went to each of the eight corners of the streets intersecting Monument Circle, and to other sidewalk locations close the Monument Circle (*e.g.*, Washington and Meridian Streets, Market and Pennsylvania Streets, and Illinois and Market Streets), to talk to pedestrians and hand out the small copies of the Constitution to individuals who wanted them.  [Filing No. 22-1 at 5; Filing No. 22-2 at 1; Filing No. 22-3 at 2.]  Staff and volunteers also solicited donations to the ACLU of Indiana, and asked some individuals whether they wanted to join the organization.  [Filing No. 22-1 at 5; Filing No. 22-3 at 1-2.]  There is a membership fee to join the ACLU of Indiana, and no tangible item of value is given to members when they join.  [Filing No. 22-1 at 5; Filing No. 22-2 at 3.]  Some individuals were asked to support the ACLU of Indiana financially without being offered a small copy of the Constitution and without membership being discussed.  [Filing No. 22-2 at 3.]  Some individuals immediately contributed to the ACLU of Indiana, and some agreed to join the organization after being invited to do so.  [Filing No. 22-1 at 5.]  The Constitution Day celebration in 2020 and in future years will likely involve similar activities in the same locations.  [Filing No. 22-1 at 5.]

At the Constitution Day celebration in 2020 and in future years, Ms. Henegar, Ms. Blair, and Mr. Hudelson plan to discuss the significance of the Constitution and the importance of constitutional rights, along with soliciting donations and membership in the ACLU of Indiana.

[Filing No. 22-1 at 5-6; Filing No. 22-2 at 3; Filing No. 22-3 at 2.]  Ms. Henegar, Ms. Blair, and Mr. Hudelson have had conversations with individuals at past Constitution Day celebrations where they were joined by other ACLU of Indiana employees or volunteers while soliciting the individuals for donations or organizational membership, and they plan to do so at future Constitution Day celebrations.  [Filing No. 22-1 at 6; Filing No. 22-2 at 3; Filing No. 22-3 at 2.]

### D.  Plaintiffs' Concerns With the Statute

Plaintiffs believe that their activities on Constitution Day fall within the definition of "panhandling" because they solicit immediate donations or something of value from individuals. [Filing No. 22-1 at 6; Filing No. 22-2 at 4; Filing No. 22-3 at 2.]  The small copies of the Constitution that are offered to individuals are of little or no monetary value, and a reasonable person who received a copy of the Constitution and also contributed would understand that the contribution is a donation.  [Filing No. 22-1 at 6; Filing No. 22-2 at 4; Filing No. 22-3 at 2.]

Plaintiffs are not sure of the precise meaning of the language in the amended version of § 35-45-17-2, but they assume that the Monument would be considered a site that is of "historical importance or interest that is preserved as public property," as specified in the amended version of the statute.  [Filing No. 22-1 at 6; Filing No. 22-2 at 4; Filing No. 22-3 at 2-3.]  Accordingly, Plaintiffs presume that the amended version of § 35-45-17-2 would prevent the ACLU of Indiana and its volunteers and employees from conducting their Constitution Day celebration activities on the Monument or within 50 feet of the Monument.  [Filing No. 22-1 at 6; Filing No. 22-2 at 4; Filing No. 22-3 at 2-3.]

Plaintiffs are also aware that the amended version of § 35-45-17-2 prohibits individuals from panhandling within 50 feet of other locations, such as the entrance or exit to a bank, business, or restaurant, a parking meter, or any other location where a financial transaction occurs.  [Filing

No. 22-1 at 6-7; Filing No. 22-2 at 4; Filing No. 22-3 at 3.]  The ACLU of Indiana interprets the amended language to prohibit panhandling within 50 feet of the boundaries of businesses, not just the businesses' exits and entrances.  [Filing No. 22-1 at 6-7.]  Even if the 50-feet boundary applies only to entrances and exits, Plaintiffs are aware that the prohibition on panhandling within 50 feet of establishments and places where financial transactions take place would prohibit them and their volunteers from being able to solicit donations and memberships at almost all, if not all, of the street corner locations where they have done so in the past, and wish to do so in the future.  [Filing No. 22-1 at 7; Filing No. 22-2 at 4-5; Filing No. 22-3 at 3.]

Plaintiffs would like to continue holding their Constitution Day activities in the Monument Circle area because this area has the largest number of people who can be approached by ACLU of Indiana employees and volunteers and also because the Monument marks the center of Indianapolis.  [Filing No. 22-1 at 7-8.]  And, given that most of downtown Indianapolis' sidewalks contain parking meters that accept payment or nearby pay stations, Plaintiffs believe that there are practically no places where they and ACLU of Indiana volunteers will be able to celebrate Constitution Day and solicit once the amendments to § 35-45-17-2 take effect on July 1, 2020.  [Filing No. 17-3; Filing No. 22-1 at 8-9.]  Additionally, even if there is not a parking meter or pay station on a given part of a downtown sidewalk, the sidewalk is generally within 50 feet of the establishments listed in the amended version of § 35-45-17-2.  [Filing No. 22-1 at 8.]  The amended version of § 35-45-17-2 has the effect of banning panhandling from virtually all, or most, of downtown Indianapolis.  [Filing No. 22-1 at 9.]  The ACLU of Indiana will not place its employees or volunteers in jeopardy of violating the law, so it will not be able to engage in the planned Constitution Day celebration absent an injunction from the Court.  [Filing No. 22-1 at 9.]

### III.
#### STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). It is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) (quotations and citations omitted). "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (holding that "plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request").

The purpose of a preliminary injunction is to preserve the parties' positions until a trial on the merits can be held. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 965 (7th Cir. 2018) (quotation and citation omitted).

In the "threshold phase," a party seeking a preliminary injunction must show that: "(1) it will suffer irreparable harm in the period before the resolution of its claim; (2) traditional legal remedies are inadequate; and (3) there is some likelihood of success on the merits of the claim." *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cnty. of Marion, Ind.*, 889 F.3d 432, 437 (7th Cir. 2018) (citation omitted). "If the plaintiff fails to meet any of these threshold requirements, the court must deny the injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (quotation and citation omitted). "However, if the plaintiff passes that threshold 'the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest.'"

11

*Id.* (quoting *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 896
F.3d 809, 816 (7th Cir. 2018)).

The Court notes at the outset that Defendants do not dispute Plaintiffs' characterization of
the statute, nor Plaintiffs' interpretation of how the statute – in both its pre-amendment and
amended forms – will affect Plaintiffs' activities at the Constitution Day celebration.  Specifically,
Defendants do not dispute that:

- Plaintiffs' planned activities on Constitution Day fall within the definition of
"panhandling" under the pre-amendment and amended versions of the statute;

- Plaintiffs plan to panhandle in teams of two, which would violate both the pre-
amendment and amended versions of the statute;

- Plaintiffs would violate the amended version of the statute if they conduct their
Constitution Day celebration on the Monument, or within 50 feet of it;

- The amended version of the statute will prevent Plaintiffs from being able to
solicit donations and memberships at almost all, if not all, of the street corner
locations where they have engaged in this behavior in the past, and wish to do
so in the future, since virtually all of these locations are within 50 feet of the
establishments and places of "financial transactions" set out in the statute; and

- There are virtually no locations in downtown Indianapolis where Plaintiffs and
ACLU of Indiana volunteers will be able to engage in their Constitution Day
celebration and solicitation under the amended version of the statute.

The Court considers each requirement for the issuance of a preliminary injunction within those
parameters.

## IV.
### DISCUSSION

The Court first considers whether Plaintiffs have demonstrated a likelihood of success on
the merits, and then turns to the remaining factors that must be present for preliminary injunctive
relief.  *See Higher Society of Ind. v. Tippecanoe Cnty, Indiana*, 858 F.3d 1113, 1116 (7th Cir.
2017)* ("[T]his is a free speech case and 'in First Amendment cases, 'the likelihood of success on

the merits will often be the determinative factor'"") (quoting *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) and *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)).

### A.  Likelihood of Success on the Merits

In support of their Motion for Preliminary Injunction, Plaintiffs argue that they are adversely affected by both the pre-amendment and amended versions of § 35-45-17-2, that the pre-amendment and amended versions of the statute violate the First Amendment, and that portions of the pre-amendment and amended versions of the statute are unconstitutionally vague.  [Filing No. 22 at 13-14.]

#### 1.  Standing

At the outset, the Court addresses whether Plaintiffs have standing to pursue the issuance of a preliminary injunction.  Plaintiffs argue that their conduct at past Constitution Day celebrations "falls within the statutory definition of panhandling as defined by…§ 35-45-17-1-(b)," and that they would like to continue this same conduct at future Constitution Day celebrations. [Filing No. 22 at 13.]  Plaintiffs note that they would also like to solicit donations alongside other ACLU of Indiana employees and volunteers, despite the statute's prohibition on panhandling with at least one other individual, in both its pre-amendment and amended forms.  [Filing No. 22 at 13-14 (discussing Ind. Code § 35-45-17-2(8) and Ind. Code § 35-45-17-2(7) (amended eff. July 1, 2020)).]  Further, they would like to "implore persons to support the Constitution and the ACLU of Indiana," although they are uncertain whether this would violate the statute.  [Filing No. 22 at 14.]  In short, Plaintiffs assert that "[t]he challenged law…criminalizes behavior that plaintiffs plan to engage in on Constitution Day in 2020 and on future Constitution Days."  [Filing No. 22 at 14.]

Defendants do not address whether Plaintiffs have standing.  [*See* Filing No. 28.]

In order to establish standing under Article III, Plaintiffs must demonstrate: "(i) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a causal relation between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision." *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004) (quotation and citation omitted).

The evidence establishes that Plaintiffs would be injured if the statute remains in effect for the Constitution Day celebration, given that they plan to solicit donations at the event; that the statute would be the cause of their injury because it would prohibit their planned activities; and that enjoining enforcement of the statute would remedy their injury. Accordingly, the Court finds that Plaintiffs have standing to challenge the constitutionality of the statute.

### 2.   *First Amendment Analysis*

Plaintiffs first argue that panhandling is expressive conducted protected by the First Amendment. [Filing No. 22 at 14-16.] They contend that panhandling prohibitions are subject to strict scrutiny, and that each part of § 35-45-17-2 fails the strict scrutiny analysis. [Filing No. 22 at 17-20.] Specifically, Plaintiffs assert that Defendants "will have difficulty articulating a valid compelling governmental interest here," and that any argument that the statute furthers a compelling governmental interest would need to be supported by "evidence of a problem, presumably reviewed by the General Assembly, that the statute is designed to remedy…." [Filing No. 22 at 21.] Plaintiffs contend that simply stating that the statute is designed to protect public safety on streets and sidewalks is insufficient, and that several Indiana statutes already criminalize "behavior towards persons on sidewalks that is truly dangerous and threatening…." [Filing No. 22 at 21.] Plaintiffs also argue that the statute is not narrowly tailored and, instead, is both

14

overinclusive and underinclusive.  [Filing No. 22 at 22-25.]  For example, they assert that the statute is overinclusive because it assumes that all panhandlers constitute a threat, and that the statute covers panhandling within 50 feet of multiple locations, not just those around which panhandling might constitute a threat to public safety.  [Filing No. 22 at 23.]  Plaintiffs also note that the statute is underinclusive, stating that "[p]ersons in groups supporting a political candidate are free to approach pedestrians wherever they are and engage them in what is perhaps unwanted political speech, and even follow them down the street hectoring them."  [Filing No. 22 at 24-25.]  Finally, Plaintiffs argue that, in any event, the statute is unconstitutionally vague because it does not define "historical importance or interest" to be used in determining what constitutes a public monument, nor does it set forth how to determine whether a panhandler is making a communication that would cause a reasonable person to feel compelled to donate.  [Filing No. 22 at 27-29.]

In their response, Defendants acknowledge that panhandling is entitled to First Amendment protection, but argue that the statute is "a permissible time, place, and manner restriction."  [Filing No. 28 at 4-7.]  They assert that the statute promotes a compelling state interest, namely "promoting the safety and convenience of [Indiana] citizens on public streets."  [Filing No. 28 at 7.]  Defendants point to Plaintiffs' argument that other statutes address public safety, and argue that "Plaintiffs' cursory recitation of other Indiana statutes does not take into account the particulars of what Indiana's panhandling statute is trying to achieve and the aims of these other criminal laws."  [Filing No. 28 at 8.]  They claim that the Seventh Circuit has found that vocal requests for money create a threatening environment or, at the least, a nuisance, and that the government has a legitimate interest in promoting the safety and convenience of its citizens.  [Filing No. 28 at 9-10.]  Defendants contend that the statute "is trying to create a safe space where there is no verbal request

for money that could escalate to more serious criminal behavior," that the statute "ensures the easy flow of foot traffic and provides a safe place for people to park their cars, go shopping, and purchase food without fear of being confronted with a request for money," and that it "allows for passive panhandling by holding a sign or performing music, including within 50 feet of a public monument, business, or bank." [Filing No. 28 at 10.]  Defendants also state that the amended version of the statute "removes the prohibition for panhandling at night, thus creating more opportunities for people to passively solicit funds, even within the proscribed areas." [Filing No. 28 at 10.] Defendants argue that the statute is not unconstitutionally vague.  [Filing No. 28 at 11-12.]

Plaintiffs argue in their reply that Defendants address whether the statute is a permissible time, place, and manner restriction, which is the relevant inquiry when applying intermediate scrutiny, but then Defendants seemingly make an alternative argument by addressing strict scrutiny.  Plaintiffs note that Defendants' "argument in this regard is not clear." [Filing No. 32 at 5-6.]  Plaintiffs reiterate their argument that the statute is subject to strict scrutiny review, and assert that Defendants have not shown that the statute furthers a compelling governmental interest. [Filing No. 32 at 7-8.]  They argue that "all [Defendants] offer[] is speculation," and "[t]here is not one shred of evidence offered to justify any public safety restrictions on panhandling, let alone an outright ban on all panhandling in virtually every downtown area in Indiana." [Filing No. 32 at 9.]  Plaintiffs contend that Defendants imply that "asking for funds is already serious behavior, with 'more serious behavior' lurking," but argue that "[n]ot wanting persons to exercise their constitutional rights is not a compelling reason to deny those rights." [Filing No. 32 at 10.] Plaintiffs go on to distinguish cases relied upon by Defendants, and reiterate their argument that

the statute is not narrowly tailored and is unconstitutionally vague in any event.  [Filing No. 32 at 10-21.]

"The likelihood of success on the merits is an early measurement of the quality of the underlying lawsuit." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011). "The likelihood of success requirement is a low threshold" under which the movant "must only show that its claim's chance of success is better than negligible." *HH-Indianapolis, LLC,* 889 F.3d at 437 (quotation and citation omitted); *see also AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002) ("In the first phase of the analysis, the court decides only whether the plaintiff has any likelihood of success – in other words, a greater than negligible chance of winning").

In analyzing First Amendment free speech claims, the Court will engage in a three-step process and: (1) determine whether Plaintiffs' speech is protected by the First Amendment; (2) identify the nature of the forum; and (3) "assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Defense & Educ. Fund Inc.,* 473 U.S. 788, 797 (1985).

     a. <u>Nature of Plaintiffs' Speech</u>

The parties agree that panhandling is a form of expression protected by the First Amendment, and the Court concurs.  *See Gresham v. Peterson*, 225 F.3d 899, 904 (7th Cir. 2000) ("While some communities might wish all solicitors, beggars and advocates of various causes be vanished from the streets, the First Amendment guarantees their right to be there, deliver their pitch and ask for support") (citing *Vill. of Shaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632 (1980)).

b.  Nature of the Forum

Here, Plaintiffs seek to panhandle on public streets.  Public streets fall under the category of "traditional public fora," *Cornelius*, 473 U.S. at 802; *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515 (1939).  The Court goes on to consider whether the exclusion from the public forum that the statute sets forth meets the requisite standard.

c.  Application of the Standard of Review

In order to determine which level of scrutiny to apply, the Court begins its analysis by determining whether the statute is content-based.  A restriction is content-based if it: (1) "applies to particular speech because of the topic discussed or the idea or message expressed"; or (2) even if "facially content neutral," cannot be "justified without reference to the content of the regulated speech," or was "adopted by the government because of disagreement with the message [the speech] conveyed."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (internal quotation marks omitted); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

In both its pre-amendment and amended forms, the statute regulates solicitation by "requesting an immediate donation of money or something else of value," either through an oral request; in exchange for performing music, singing, or engaging in another type of performance; or by offering the individual an item of little or no monetary value.  Ind. Code § 35-45-17-1 (defining "panhandling").  The statute's plain text establishes its content-based nature, because it defines the prohibited conduct by referring to the content of the speech – a request for an immediate donation of money or something else of value – and by referring to the function of the speech – requesting the donation or something else of value.  *Reed*, 576 U.S. at 163 ("[The] commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys.  Some facial distinctions

based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose.  Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny") (citation omitted); *see also Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412 (7th Cir. 2015) (holding that an ordinance regulating panhandling was content-based because it "regulates 'because of the topic discussed'").[4]  Each part of the statute at issue here, both in its pre-amendment form and as amended, incorporates the definition of "panhandling," and is therefore content-based.

Because both versions of the statute are content-based, the Court will apply strict scrutiny in order to determine whether they violate the First Amendment.  *Reed*, 576 U.S. at 163 ("Content-based laws – those that target speech based on its communicative content – are presumptively unconstitutional" and are subject to strict scrutiny).[5]  Under a strict scrutiny analysis, Defendants "bear[ ] the heavy burden to show that [the] restrictions remain 'narrowly tailored to promote a compelling Government interest.'"  *Swart v. City of Chicago*, --- F. Supp.3d ----, 2020 WL 832362, at *10 (N.D. Ill. 2020) (quoting *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 646 (7th Cir.

---

[4] Even though the statute does not distinguish between types of requests for money – *e.g.*, by only prohibiting solicitations for certain organizations but not others – the statute is still a content-based regulation to which strict scrutiny applies.  *See Reed*, 576 U.S. at 169 ("[A] speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter.  For example, a law banning the use of sound trucks for political speech – and only political speech – would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be expressed") (citations omitted).

[5] As noted, Defendants argue that the statute passes the intermediate level of scrutiny and is a permissible time, place, and manner restriction.  [Filing No. 28 at 4-5.]  But they then go on to argue that the statute serves a compelling state interest and is narrowly tailored to achieve that purpose – the analysis to be undertaken when applying strict scrutiny.  Defendants' approach is confusing, and does not change the Court's conclusion that it must apply a strict scrutiny level of review to the statute.

2006)).  A restriction will not pass strict scrutiny where a "less restrictive alternative" exists to achieve the Government's compelling interest.  *Entm't Software Ass'n*, 469 F.3d at 646.

In order to show that a restriction is necessary to further a compelling governmental interest, Defendants cannot rely upon "anecdote and supposition," *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000), but instead "must specifically identify an 'actual problem' in need of solving," *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quoting *Playboy Entm't Grp.*, 529 U.S. at 822).  Defendants identify the following compelling interests that they claim the statute furthers:

- "[P]romoting the safety and convenience of its citizens on public streets," [Filing No. 28 at 7];

- Keeping solicitation from being "disruptive to business and imped[ing] the normal flow of traffic," [Filing No. 28 at 8];

- Preventing situations addressed by other Indiana statutes – such as statutes addressing battery, disorderly conduct, theft, and robbery – from "occur[ing] in the first place by avoiding a confrontation between a solicitor and the general public with a verbal request for money," [Filing No. 28 at 8-9];

- Providing "a safe place for people to enjoy public spaces," [Filing No. 28 at 9];

- Preventing "an initial action of intimidating behavior" from "escalat[ing] to multiple acts," [Filing No. 28 at 9];

- Preventing "undue duress or harassment of individuals in circumstances where they may be more vulnerable, such as in the midst of a financial transaction or while stationary in a vehicle," [Filing No. 28 at 10]; and

- Providing "a safe place for people to park their cars, go shopping, and purchase food without fear of being confronted with a request for money," [Filing No. 28 at 10].

The problem, however, is that Defendants have not presented any evidence demonstrating that panhandling threatens these interests.  For example, they do not provide any statistics linking panhandling to disruptions to business, or showing that panhandling typically escalates to criminal

20

behavior.  And simply stating that individuals may not want to be approached for a solicitation is not enough to show a compelling interest.  *Norton*, 324 F. Supp.3d 994, 1003 (C.D. Ill. 2018) ("[T]he Court recognizes that many individuals do not welcome a solicitation or request from a stranger for an 'immediate donation.'  However, this does not mean that the regulation is necessary or that the government interest is compelling.  The individual in most cases can simply avert his eyes or walk away if he wishes to avoid such an encounter").

This case is not a close call, because Defendants submit no evidence whatsoever to support the notion that the statute furthers a compelling governmental interest.  What little they do provide – *ex post facto* justifications for the statute, based purely on speculation – is not enough to satisfy the "heavy burden" Defendants carry in defending the statute under a strict scrutiny analysis.  *See Fisher v. Univ. of Texas*, 570 U.S. 297, 313-14 (2013) ("Strict scrutiny does not permit a court to accept a school's assertion that its admissions process uses race in a permissible way without a court giving close analysis to the evidence of how the process works in practice…. Strict scrutiny must not be strict in theory but feeble in fact.  In order for judicial review to be meaningful, a university must make a showing that its plan is narrowly tailored to achieve the only interest that this Court has approved in this context…."); *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest"); *Swart*, 2020 WL 832362, at *11 (where the record contained no evidence that plaintiffs' activities interfered with individuals' enjoyment of art or other programming at a city park, "the City's purported need for the broad restrictions [on plaintiffs' activities] stems solely from speculation that constitutionally protected activity 'would harm' or 'would deleteriously impact' the Park's aesthetic values and the public's enjoyment of art," and the City "fail[ed] to show a compelling state interest to justify its significant restrictions"); *Norton*,

21

324 F. Supp.3d at 1002 (ordinance prohibiting panhandling within five feet of someone did not pass strict scrutiny where "[t]he City did not produce any evidence of public safety being compromised by a panhandler approaching within five feet of someone").

Because Defendants have not set forth any evidence of "an actual problem in need of solving," *Swart*, 2020 WL 832362, at *11, they have not met their burden of showing that the statute furthers a compelling governmental interest.  Accordingly, Plaintiffs have shown that they have a likelihood of success on the merits of their claim that the statute, in both its pre-amendment and amended forms, violates the First Amendment.[6]

### B.  Adequacy of Traditional Legal Remedies

The Court considers the second threshold requirement for the issuance of a preliminary injunction.

Plaintiffs argue that, because they "will suffer a continued assault of their First Amendment rights" absent an injunction, money damages are inadequate.  [Filing No. 22 at 29-30.]

Defendants do not address the adequacy of legal remedies requirement in their response brief.  [Filing No. 28 at 13-14.]

---

[6] Because the Court has found that Defendants have failed to meet their burden of showing that the statute furthers a compelling governmental interest, it need not consider whether the statute is narrowly tailored.  The Court notes, however, that the statute in its amended form would prohibit panhandling on virtually all sidewalks in downtown Indianapolis.  [*See* Filing No. 17-3 (Map of Parking Meters in downtown Indianapolis).]  Additionally, while the Court need not consider whether the statute is unconstitutionally vague, it notes that, under both the pre-amendment and amended versions of the statute, what statements, gestures, or communications might "cause a reasonable individual…to feel compelled to donate," such that they constitute "panhandling" may differ from individual to individual.  Additionally, the definition of "public monument," which is incorporated into the amended version of the statute, also appears to include a subjective component.  *See* Ind. Code § 35-45-17-1.5 (amended eff. July 1, 2020) (defining "public monument" as "a building, structure, or site that is of historical importance or interest that is preserved as public property").

In their reply, Plaintiffs reiterate their argument that a First Amendment violation results in a harm that cannot be adequately remedied at law.  [Filing No. 32 at 21-22.]

The deprivation of First Amendment rights is one for which no adequate remedy at law exists.  *See, e.g.*, *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (in cases involving restrictions on First Amendment rights, "the quantification of injury is difficult and damages are therefore not an adequate remedy") (quotation and citation omitted); *Christian Legal Society v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which damages are not adequate"). Plaintiffs have sustained their burden of showing that there is no adequate remedy at law for the harm they would suffer absent a preliminary injunction.

### C.  Likelihood of Suffering Irreparable Harm Absent an Injunction

Plaintiffs argue that they face irreparable harm absent an injunction, including either being arrested or receiving a citation, or altering or ceasing their expressive activity under the First Amendment.  [Filing No. 22 at 29.]

In their response, Defendants argue that "Plaintiffs have failed to represent to the Court any sort of metric for the funds they've raised, or the members they've recruited, as a result of their Constitution Day solicitations," and that "[a]t best, the ACLU collects $50 through their solicitation at Monument Circle on each Constitution Day…, but receives $1 million to $2.7 million in annual grants and donations."  [Filing No. 28 at 13.]

In their reply, Plaintiffs argue that the irreparable harm is not because the ACLU of Indiana has lost a certain number of new memberships or a certain amount of money, but rather that Plaintiffs' First Amendment rights have been violated.  [Filing No. 32 at 21.]  They assert that a

violation of First Amendment rights is enough to satisfy the irreparable harm requirement.  [Filing No. 32 at 21-22.]

Plaintiffs must demonstrate that they "will likely suffer irreparable harm absent obtaining preliminary injunctive relief."  *Whitaker*, 858 F.3d at 1044-45 (7th Cir. 2017) (citing *Michigan*, 667 F.3d at 787).  Establishing a likelihood of irreparable harm "requires more than a mere possibility of harm.  It does not, however, require that the harm actually occur before injunctive relief is warranted.  Nor does it require that the harm be certain to occur before a court may grant relief on the merits."  *Whitaker*, 858 F.3d at 1045 (quotations and citations omitted).  The Seventh Circuit has instructed that "harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial."  *Id.* (quotations and citations omitted).

It is well-settled that the inability to exercise rights guaranteed by the First Amendment constitutes the type of irreparable harm that supports the issuance of an injunction.  *See, e.g.*, *Higher Society of Ind.*, 858 F.3d at 1116 ("[E]ven short deprivations of First Amendment rights constitute irreparable harm"); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ("[F]or some kinds of constitutional violations, irreparable harm is presumed…. This is particularly true in First Amendment claims"); *Christian Legal Society*, 453 F.3d at 867 ("[V]iolations of First Amendment rights are presumed to constitute irreparable injuries").  Defendants need not show that the ACLU of Indiana would lose a certain number of memberships or a certain amount of money absent an injunction.  The fact that the statute would deprive Defendants of exercising their First Amendment rights at the Constitution Day celebration is sufficient for Plaintiffs to establish irreparable harm absent an injunction.

### D.  Balance of Harms

Plaintiffs argue in support of their Motion for a Preliminary Injunction that the balance of harms favors them because without an injunction, their constitutional rights will be violated, and Defendants "cannot claim that requiring [them] to comply with the Constitution is harmful." [Filing No. 22 at 30.]

Defendants respond that they have a duty to protect the public from "harassment by panhandlers, which would decrease the public's enjoyment of business and public monuments," and that "[i]f the public does not feel safe or comfortable patronizing…commercial areas, it is likely that businesses will suffer, and thus local economies will suffer." [Filing No. 28 at 14.]

In their reply, Plaintiffs note that Defendants have not presented any evidence to support their contention that panhandling is causing problems in Indiana. [Filing No. 32 at 23.]

Once the plaintiff has met its burden of showing that it has a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm absent an injunction, "the court must weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *Planned Parenthood of Ind. and Ky., Inc.*, 896 F.3d at 816.  The Seventh Circuit "employs a sliding scale approach," where "'[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id.* (quoting *Valencia*, 883 F.3d at 966).

Defendants rely upon the interests they argue the statute furthers – for example, public safety and protecting downtown areas from interference with the public's enjoyment of businesses and public monuments – in contending that the balance of harms weighs in favor of not enjoining enforcement of the statute.  But, as discussed above, these interests are purely speculative.

Defendants have not presented any evidence that these issues exist and that panhandling is the cause of these issues.  Without some proof of that causal link, Defendants cannot show that they will suffer harm if enforcement of the statute is enjoined.  Further, given that the statute is a clear violation of the First Amendment as explained above, the balance of harms would need to weigh heavily in Defendants' favor.  It does not.

### E.  Public Interest

Finally, Plaintiffs contend that the issuance of an injunction would serve the public interest because injunctions that protect First Amendment freedoms are always in the public interest. [Filing No. 22 at 30.]

Defendants disagree, arguing in their response that the statute "protects the safety and convenience of the public, and allows for the free flow of traffic on the streets, sidewalks, and within businesses," and that "[t]he vast majority of the public would prefer to avoid being confronted by a stranger with verbal requests for money, food, or other items of value." [Filing No. 28 at 14.]  Defendants also assert that the concern of being confronted by a person asking for money "is exacerbated by the current COVID-19 pandemic sweeping the world." [Filing No. 28 at 14-15.]

In their reply, Plaintiffs argue that Defendants have not presented evidence that the statute would further protect the public and that "of course, constitutional rights cannot be sacrificed based on public preferences." [Filing No. 32 at 24.]  Plaintiffs note that as of the date they filed their reply, Indiana was in Stage 3 of reopening amidst the COVID-19 pandemic, that "the State's suggestion that panhandling needs to be prohibited as a way of fighting the virus appears overblown," and that "[a] panhandler can maintain social distance in the same manner as a person in a community pool, state park inn, or mall." [Filing No. 32 at 24.]

26

After finding that the plaintiff has satisfied the threshold requirements for a preliminary injunction, the Court must also consider "whether an injunction is in the public interest." *Planned Parenthood of Ind. and Ky.*, 896 F.3d at 816. That analysis is easy in this case. Defendants have not presented any evidence supporting their claimed public interests. Conversely, "protecting First Amendment freedoms always serves the public interest." *Swart*, 2020 WL 832362, at *13; *see also Higher Society of Ind.*, 858 F.3d at 1116 ("[T]he public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional") (quotation and citation omitted); *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) ("[I]njunctions protecting First Amendment freedoms are always in the public interest") (quotation and citation omitted). The Court finds that enjoining enforcement of the statute would serve the public interest.[7]

## V.
### CONCLUSION

"[U]npopular speech remains protected by the First Amendment," *Ovadal v. City of Madison, Wis.*, 416 F.3d 531, 536 (7th Cir. 2005), and "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable," *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Plaintiffs have shown – along with satisfying the other requirements for the issuance of a preliminary injunction – that they have a likelihood of succeeding on the merits of their claim

---

[7] The Court acknowledges Defendants' concerns with the COVID-19 pandemic, and the importance of social distancing while engaging in panhandling. It also notes, however, that, as of the date of this Order, Indiana is in Stage 4 of Governor Eric Holcomb's Roadmap to Safely Reopen Indiana. In Stage 4, an increasing number of businesses, entertainment venues, and tourism sites are now open. https://www.backontrack.in.gov. Defendants do not provide any evidence that the COVID-19 pandemic warrants a complete ban on panhandling, and the Court also points to Ms. Henegar's Third Declaration, in which she states that "[t]he ACLU will, as appropriate and necessary, have its employees and volunteers maintain social distancing to ensure safety" while soliciting funds and memberships. [Filing No. 32-1 at 1.]

that § 35-45-17-2, in both its pre-amendment and amended forms, is a content-based prohibition on free speech that violates the First Amendment.  Accordingly, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction, [10].[8]  Defendants are **PRELIMINARILY ENJOINED** until further order of this Court from enforcing Indiana Code § 35-45-17-2, both in its pre-amendment form and as amended and effective July 1, 2020.  Defendants are **ORDERED** to inform all affected Indiana state governmental entities of this injunction.[9]


Date: 6/30/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

---

[8] Plaintiffs argue in support of their Motion for Preliminary Injunction that the Court should not require a bond because the issuance of a preliminary injunction "will not impose any monetary injuries on the defendants." [Filing No. 22 at 30.] Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." But if "there's no danger that the opposing party will incur any damages from the injunction," a court may choose not to require a bond. *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). Defendants do not address Plaintiffs' argument in their response, so the Court presumes that they do not object to Plaintiffs' request that the Court not require a bond. *See Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 395 (7th Cir. 2012) (noting that a party concedes a point by failing to respond to it in their response brief). Consequently, and because Defendants have not shown that they will incur any damages if an injunction issues in any event, the Court will not require Plaintiffs to post a bond.

[9] Federal Rule of Civil Procedure 65(d)(2) provides that a preliminary injunction binds the parties; their officers, agents, servants, employees, and attorneys; and "other persons who are in active concert or participation with [the parties or their officers, agents, servants, employees, and attorneys]." Fed. R. Civ. P. 65(d)(2). The Court finds that all law enforcement agencies and prosecutors in Indiana are acting in concert with the parties in the enforcement of § 35-45-17-2, and that this Order and the preliminary injunction applies to those entities as well. *See H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 842 (7th Cir. 2012) (finding that district court had wide discretion to bind third-party to injunction under Rule 65(d)(2) where it was "necessary to give effect to its order").

28